Harry LEWIS, Plaintiff,

v.

Charles A. ANDERSON, J. Paul Austin, Ralph E. Bailey, Howard W. Blauvelt, Charles W. Buek, Willard H. Burnap, John Corcoran, Wayne E. Glenn, C. Howard Hardesty, Jr., William A. Hewitt, Gilbert E. Jones, John E. Kircher, Archie R. McCardell, Neil J. McKinnon, Lauris Norstad, Frank Pace, Jr., James E. Robison, J. S. Royds, A. W. Tarkington, Continental Oil Company, and "John Doe", "Richard Roe", and other "John Does", said names being fictitious, their true names being presently unknown to plaintiff, the parties intended being the present and former officers and employees of Continental Oil Company and its subsidiaries who were granted stock options which have been or may be exercised by them pursuant to Continental Oil Company's 1971 Non-Qualified Stock Option Plan, as amended in 1975, Defendants.

No. 77 Civ. 55 (RJW).

United States District Court, S. D. New York.

Dec. 22, 1978.

On Application for Counsel Fees Feb. 21, 1979.

Morris J. Levy, Levy & Levy, Stephen A. Levy, New York City, for plaintiff.

Merrel E. Clark, Jr., Robert J. Sussman, Winthrop, Stimson, Putnam & Roberts, New York City, for defendants Anderson, Austin, Buek, Hewitt, Jones, McCardell, Norstad, Pace, Jr., Robison and Tarkington.

Robert C. Myers, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for defendants Bailey, Blauvelt, Corcoran, Kircher & Estate of Royds; Theodore Lackland, of counsel.

Paul Martin Wolff, Williams & Connolly, Washington, D. C., for defendant Willard H. Burnap.

William G. Primps, LeBeouf, Lamb, Leiby & MacRae, New York City, for defendant Wayne E. Glenn; Grant S. Lewis, New York City, of counsel.

George J. Grumbach, Jr., Cleary, Gottlieb, Steen & Hamilton, New York City, for defendant C. Howard Hardesty, Jr; Walter M. Volpi, New York City, of counsel.

Charles W. Grinnell, New York City, for defendant Continental Oil Co.

ROBERT J. WARD, District Judge.

This derivative action by Harry Lewis, a stockholder of Continental Oil Company ("Continental"), charges defendants, present and former directors, officers and employees of Continental, with violations of the Securities Exchange Act of 1934 ("the Act") and with breach of fiduciary duties owed to Continental. The complaint alleges that the defendants made at least $250,000 in secret, unauthorized and illegal payments as foreign and domestic bribes, payoffs and political contributions and failed to disclose such payments in a proxy statement issued in 1975 which, among other things, sought stockholder approval for certain amendments to Continental's 1971 Non-Qualified Stock Option Plan for Officers and Other Key Employees ("the Plan"). These acts

are alleged to have resulted in violations of §§ 10(b), 13(a), and 14(a) of the Act, 15 U.S.C. §§ 78j(b), 78m(a), and 78n(a) as well as the breach of defendants' fiduciary duties. Plaintiff also claims that defendants' surrender of stock options under the Plan constituted simultaneous purchases and sales within the meaning of § 16(b) of the Act, 15 U.S.C. § 78p(b). The complaint seeks (i) a declaration that the 1975 amendments are null and void and rescission of all transactions thereunder, (ii) an accounting for all losses and damages allegedly sustained by Continental, and (iii) an order requiring defendants who surrendered options to Continental pursuant to the Plan to pay over any profits to Continental. Each defendant denies the material allegations of the complaint.

After extensive discovery and negotiations, counsel reached a settlement, incorporated in a Stipulation of Settlement, which they believe fairly and adequately serves the interests of Continental. They now seek an order pursuant to Rule 23.1, Fed.R. Civ.P.: (a) approving the Stipulation of Settlement, (b) adjudging the terms thereof to be fair, reasonable and adequate, and (c) directing entry of a final judgment terminating this action on the terms set forth in the Stipulation. For the reasons hereinafter stated, the Court approves the settlement as fair, reasonable and adequate.

Under the terms of the settlement, Continental and its directors and officers agree to maintain, adhere to, and enforce the policies and procedures contained in the Continental Policy Guide Concerning Compliance With Laws, Political Contributions and Questionable Corporate Payments (hereinafter "Policy Guide") "to ensure that Continental's longstanding policy of conducting business in accordance with applicable laws of the United States and the foreign countries in which it does business and in accordance with high moral and ethical standards is followed to the fullest extent." These procedures and policies are to be maintained for a period of at least three years. In addition, Continental's Board of Directors will adopt a change in its Incentive Compensation Plan ("ICP") for 1978. The ICP, adopted by Continental with the approval of its shareholders has, since 1965, attempted to attract and keep in the employ of Continental persons of experience and ability by providing additional incentives to such employees. Under the terms of the settlement, the maximum amount creditable to the Incentive Compensation Reserve of the ICP for the year 1978 will be reduced by $2 million. Continental further agrees that it will not oppose the application of plaintiff's counsel for their attorneys fees, to be paid by Continental, in an amount of up to $200,000 and expenses in an amount not in excess of $1,000.[1]

■ Before approving the settlement of a derivative action, the Court must be satisfied that the compromise "fairly and adequately serves the interests of the corporation on whose behalf the derivative action was instituted." *Republic National Life Ins. Co. v. Beasley,* 73 F.R.D. 658, 667 (S.D. N.Y.1977). The first and most important factor the Court must consider in its determination is "the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement." *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 455 (2d Cir. 1974), *quoting West Virginia v. Chas. Pfizer & Co.,* 440 F.2d 1079, 1085 (2d Cir.), *cert. denied,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971); *accord, Rosenfeld v. Black,* 336 F.Supp. 84, 87 (S.D.N.Y.1972).

All parties are of the view that Continental will be benefited by the proposed settlement. The alleged benefits which have been cited to the Court are: (1) Continental's agreement to reduce the Incentive Compensation Reserve for 1978 by $2 million; (2) its agreement to enforce the poli-

---

1. The proposed settlement also reserves to Continental the right to pursue any claims arising out of the acts and transactions alleged in the complaint which it may have against defendants Willard H. Burnap and Wayne E. Glenn, whose positions as directors and officers of Continental were terminated as a result of acts alleged in the complaint. *See* footnote, 3, *infra.* The settlement likewise preserves the rights of these two defendants with regard to any such claims they may have against Continental or each other.

cies and procedures contained in the Policy Guide; and (3) the termination of this litigation, which will prevent further expense and diversion of management from Continental's operations and which will remove any doubts about the validity of the Plan.

■ The Court finds the last of these purported benefits to Continental to be the most persuasive. The avoidance of further expense is an important reason for settlement. *See Newman v. Stein,* 464 F.2d 689, 692 (2d Cir.), *cert. denied,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972); *West Virginia v. Chas. Pfizer & Co.,* 314 F.Supp. 710, 741 (S.D.N.Y.1970), *aff'd,* 440 F.2d 1079 (2d Cir.), *cert. denied,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971), *citing Neuwirth v. Allen,* 338 F.2d 2, 3 (2d Cir. 1964).

The other suggested benefits are less readily apparent to the Court. It is, however, possible that Continental will receive some benefit from these additional factors. For example, in recent years, the amount actually distributed to key employees pursuant to the ICP. has been substantially less than the amount held in reserve for this purpose.[2] Therefore, the $2 million formerly in this reserve for 1978 may be better employed in Continental's retained earnings, where it would presumably be available for other corporate projects.

It is more difficult to find that Continental derived a substantial benefit from its agreement to comply for three years with its own guidelines and with the law relating to illegal payments. Before this action was commenced, Continental had apparently made an extensive investigation into the payments in question and had taken action to halt any illegal or unethical practices and

to inform the public and its shareholders of the results of its investigation and of the corrective action being taken.[3] Plaintiff's review of Continental's investigation disclosed no further illegality. However, it is conceivably arguable that Continental's agreement to comply with its policy and the law with regard to illegal payments for three years has served to assure its shareholders that Continental has fully disclosed any past illegal activities and will not engage in such activities in the future.

■ Although the Court does not find the benefits which Continental will derive from approval of the settlement particularly compelling, it does find the benefits adequate to warrant approval of the settlement in light of plaintiff's prospects for success on the merits should this litigation be continued.[4] Having reviewed the matter, the Court is of the opinion that plaintiff's chances for success on the merits of his claims are not at all good, particularly in view of existing persuasive case law with regard to the issues at hand.

Turning first to plaintiff's § 14(a) claim, it would appear that plaintiff would not have been able to prove the causation requirements of that statute. For example, in *Lewis v. Elam,* [1977–1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,013 (S.D. N.Y.1977), Judge Pierce of this Court granted summary judgment to defendants on plaintiff's claim that the failure to disclose questionable foreign payments and illegal campaign contributions in proxy statements, dealing, among other matters, with the adoption of certain stock option plans, violated § 14(a). The Court explained:

---

**2.** For example, in 1977, $7,154,000 was held in reserve and only $3,041,500 was distributed; in 1976, $6,048,000 was held in reserve and only $3,552,000 was distributed.

**3.** Continental had, of its own accord, (1) discharged defendants Willard H. Burnap and Wayne E. Glenn, who were allegedly responsible for the payments, (2) issued a press release announcing their removal, (3) filed an 8–K report with the Securities and Exchange Commission disclosing the results of the investigation and the actions taken to correct the situation, and (4) mailed a copy of the portion of the 8–K

report describing the results of the investigation to all Continental shareholders.

**4.** In reviewing a settlement, a court should not attempt to try the disputed issues, *Stull v. Baker,* 410 F.Supp. 1326, 1333 (S.D.N.Y.1976), *quoting Schleiff v. Chesapeake & O. Ry.,* 43 F.R.D. 175, 178–79 (S.D.N.Y.1967); *Chas. Pfizer & Co., supra,* 314 F.Supp. at 741. It must, however, form an educated opinion as to the merits of the plaintiff's claims. *Newman v. Stein, supra,* 464 F.2d at 692.

[T]he transaction of which plaintiff complains is the alleged payment of foreign bribes and illegal campaign contributions. The alleged proxy violations are said to be contained in proxies solicited by the management . . . for election of directors . . . and in connection with certain other corporate actions including . . . the adoption of certain stock option plans . . . . Even assuming the materiality of the alleged omissions, plaintiff has not shown causation between the alleged proxy violation and the transaction causing the harm of which plaintiff now complains. The proxy solicitation was not a link in the accomplishment of the alleged improper payments. See *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). "[These payments were made] by virtue of the defendant's position in the corporation and not through an authorization obtained through alleged false proxy statements." *Epic Enterprises, Inc. v. Brothers et al.,* 395 F.Supp. 773, at 776 (N.D.Okl.1975).

*Id.* ¶ 96,013 at 91,555; *accord, United States v. Fields,* [1977–1978 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 96,074 at 91,855 (S.D.N. Y.1977), *rev'd in part on other grounds,* 592 F.2d 638, No. 77–1342 (2d Cir. Sept. 14, 1978); *Levy v. Johnson,* [1976–1977 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,899 (S.D.N.Y.1977). Moreover, it would appear that plaintiff could not have proved that the failure to disclose this information in the proxy statements caused the alleged damage, as it would seem that any such damage "flow[ed] from breach of a fiduciary obligation owed as a director or officer, rather than from any shareholder vote obtained by false proxy solicitation materials." *Walner v. Friedman,* 410 F.Supp. 29, 32 (S.D.N.Y.1975); *accord, Lemmer v. General Telephone & Electronics Corp.,* [1977–1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,111 at 92,002 (S.D.N.Y.1977).

Turning next to plaintiff's claim that Continental's failure to disclose the illegal payments in any report, proxy statement, registration statement or other document filed with the S.E.C. violated section 13(a) of the Act, at least one circuit court opinion as well as a number of persuasive district court decisions in this Circuit have held that section 13(a) does not give rise to a private right of action and that section 18(a) of the Act, 15 U.S.C. § 78r(a), provides the exclusive remedy for section 13(a) violations. *See In re Penn. Central Securities Litigation,* 494 F.2d 528, 540 (3d Cir. 1974); *Lewis v. Elam, supra,* ¶ 96,013 at 91,554; *Levy v. Johnson, supra,* ¶ 95,899 at 91,324; *Meer v. United Brands Co.,* [1976–1977 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,648 (S.D. N.Y.1976); *Smith v. Murchison,* 310 F.Supp. 1079, 1088 (S.D.N.Y.1970) (dictum). *Contra, Kroese v. Crawford,* [1961–1964 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 91,262 (S.D. N.Y.1963). Section 18(a) provides for recovery by "any person (not knowing that [a] statement was false and misleading) who, in reliance upon such statement, . . . purchased or sold a security at a price which was affected by such statement . . . ." Section 18(a) clearly requires a plaintiff seeking recovery under this section to have been a purchaser or seller in reliance on the statement. *See Lewis, supra,* ¶ 96,013 at 91,554; *Levy, supra,* ¶ 95,899 at 91,324; *Meer, supra,* ¶ 95,648 at 90,213. Plaintiff does not appear to have alleged that Continental in reliance on any statement made false or misleading by Continental's failure to disclose the illegal payments purchased or sold its stock at a price affected by such statement. Therefore, it would seem unlikely that plaintiff could have prevailed on his section 13(a) claim. *See Lewis, supra,* ¶ 96,013 at 91,554; *Cramer v. General Telephone & Electronics,* 443 F.Supp. 516, 524–25 (E.D.Pa.1977).

The Court is equally skeptical as to plaintiff's likelihood of success on his claim under § 10(b) of the Act and Rule 10b–5. Although the complaint alludes to a purchase or sale with regard to this claim, it does not indicate any of the specifics of such transaction. The Court can only surmise that plaintiff intends to challenge the issuance of options or "sale" of Continental's common stock by Continental through the exercise and surrender of options pursu-

ant to the 1975 amendments to the Plan. It is questionable whether plaintiff could succeed in proving the materiality and reliance requirements of this claim. However, even assuming that plaintiff could succeed in this regard, he would still have to establish that a fraudulent omission or misrepresentation existed "in connection with" such purchase or sale of a security. The case law construing this requirement raises serious questions as to plaintiff's ability to prove this element of his § 10 and Rule 10b–5 claim. *See, e. g., Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 12–13, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); *Ross v. A. H. Robins Co.,* [Current] Fed.Sec. L.Rep. (CCH) ¶ 96,388 at 93,351–52 (S.D.N.Y.1978); *Rich v. Touche Ross & Co.,* 415 F.Supp. 95, 100 (S.D.N.Y.1976); *In re R. Hoe & Co.,* [1973–1974] Fed.Sec.L.Rep. (CCH) ¶ 94,552 at 95,923 (S.D.N.Y.1974).

Plaintiff also alleged that the acceptance by Continental of surrenders of options pursuant to these amendments, coupled with payment to the optionees, in effect constituted simultaneous purchases and sales of a security in violation of § 16(b) of the Act. Two well-reasoned district court opinions in this Circuit have flatly rejected the characterization urged by plaintiff. *See Freedman v. Barrow,* 427 F.Supp. 1129 (S.D.N.Y. 1976); *Rosen v. Drisler,* 421 F.Supp. 1282 (S.D.N.Y.1976). The reasoning of these decisions is supported by the Securities and Exchange Commission's Rules 16a–6(c) and 16b–3(e), 17 C.F.R. §§ 240.16a–6(c) and 17 C.F.R. §§ 240.16b–3(e) (1977) (hereinafter "Rules 16a–6(c) and 16b–3(e)"), which were amended, effective June 30, 1977, to provide that the surrender by a director or officer of any non-transferable stock option to the issuer pursuant to a stock option plan is exempt from the operation of section 16(b), provided that the stock option plan meets the conditions specified in Rule 16b–3(e). Under these circumstances, plaintiff's likelihood of success on his § 16(b) claim seems faint indeed.

As to plaintiff's pendent state claims regarding the alleged breach of fiduciary duties, defendants have made substantial arguments that plaintiff would not prevail on these claims at trial. Regardless, however, of the merits of the pendent state claims, continuation of this litigation presents the risk that a disposition unfavorable to plaintiff on the federal claims discussed above would result in dismissal of the pendent claims. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

On the basis of its review of all of plaintiff's claims, the Court is of the view that the benefits to Continental of settlement of this suit outweigh the likelihood that, if the settlement had not been reached, plaintiff would have been successful on the merits.

The Court has also considered and given weight to the fact that the parties and their attorneys support the proposed settlement which was reached after extensive discovery and arms-length negotiations. *Stull v. Baker, supra,* 410 F.Supp. at 1332–33; *Zerkle v. Cleveland-Cliffs Iron Co.,* 52 F.R.D. 151, 159 (S.D.N.Y.1971); *Chas. Pfizer & Co., supra,* 314 F.Supp. at 741, 744. Another important factor in favor of the proposal has been the absence, despite notice of the settlement to all Continental shareholders,[5] of any objection thereto, ei-

---

**5.** Pursuant to this Court's order of May 22, 1978, Continental mailed notice by first class mail on or prior to May 26, 1978 to each record holder. Brokers and/or nominees were requested to forward the notice promptly to beneficial holders. Continental offered to supply additional copies of the Notice and to pay for the reasonable costs of mailing such copies to beneficial holders. In addition, based upon Continental's recent experience in mailing proxies to stockholders in April, 1978, it estimated the number of additional copies of the Notice which would be required by various brokers and/or nominees. Accordingly, without waiting to receive requests for additional copies of the Notice, Continental arranged to have a total of 27,745 copies of the Notice delivered in bulk to brokers and/or nominees, simultaneously with the mailing of notice to all record holders.

In *In re Franklin National Bank Securities Litigation,* 574 F.2d 662 (2d Cir. 1978), the Court held in a Rule 23(b)(3) class action that giving notice of the maintenance of the action to "street names" or record holders with a request or direction to forward the class notice to

ther at the hearing held by the Court on June 29, 1978 or otherwise. *Stull, supra,* 410 F.Supp. at 1333.

■ For the foregoing reasons, the Court concludes that the proposed settlement is fair, reasonable and adequate and should be approved.

Order and final judgment signed.

### On Application For Counsel Fees

Plaintiff's attorneys apply for counsel fees in the amount of $200,000.00 and disbursements of $967.47 in a shareholder's derivative action settled with the approval of the Court on December 22, 1978. In accordance with the terms of the settlement, defendants have interposed no objection to this application. For the reasons hereinafter stated, the application of plaintiff's attorneys for fees is granted in the amount of $5,000.00 plus disbursements of $967.47.

This derivative action, brought on behalf of Continental Oil Company ("Continental"), charged defendants, present and former directors, officers and employees of continental, with violations of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78m(a), 78n(a), and 78p(b), and with breach of fiduciary duties owed to Continental.

The parties urged that the settlement contained three benefits to the corporation: "(1) Continental's agreement to reduce the Incentive Compensation Reserve for 1978 by $2 million; (2) its agreement to enforce the policies and procedures contained in the [Continental Policy Guide Concerning Compliance With Laws, Political Contributions and Questionable Corporate Payments]; and (3) the termination of this litigation,

which will prevent further expense and diversion of management from Continental's operations and which will remove any doubts about the validity of the [Incentive Compensation] Plan". (Decision, December 22, 1978, 81 F.R.D. at 438).

Keeping in mind that attorneys' fees in a shareholder derivative suit should be awarded "with an eye to moderation," *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 470 (2d Cir. 1974) (*Grinnell I*), in order "to avoid even the appearance of awarding 'windfall' fees," *Barnett v. Pritzker,* 73 F.R.D. 430, 431 (S.D.N.Y.1977), the court must determine whether the suit engendered "an actual, practical benefit in the business sense," *Globus, Inc. v. Jaroff,* 279 F.Supp. 807, 809 (S.D.N.Y.1968), so as to "render[ ] a substantial service to the corporation and its shareholders." *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 396, 90 S.Ct. 616, 627, 24 L.Ed.2d 593 (1970). This is in furtherance of the notion that

> there should be some check on derivative actions lest they be purely strike suits of great nuisance and no affirmative good, and hence it is ruled that the benefit to the corporation and the general body of shareholders must be substantial.

*Schechtman v. Wolfson,* 244 F.2d 537, 540 (2d Cir. 1957). Further, "[a]n essential condition precedent to the award . . . is a showing that the attorney's services were a competent producing cause of the supposed benefit conferred." *Wechsler v. Southeastern Properties, Inc.,* 506 F.2d 631, 635 (2d Cir. 1974), *i.e.,* that the benefit "was a result of this suit." *Lewis v. Bergethon,* 1978 Fed.Sec.L.Rep. ¶ 96,289 at 92,840 (S.D. N.Y.1978).

beneficial owners was not sufficient to comply with the Rule. 574 F.2d at 671. The issue in the *Franklin National Bank* case, however, was the adequacy of the notice under Rule 23(c)(2), which requires in Rule 23(b)(3) class actions that the notice of the maintenance of the class action be "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *See id.* at 670. By contrast, Rule 23.1, which governs the instant stockholder's derivative suit, requires only that notice be

given "in such manner as the court directs." Accordingly, the Court is of the view that the holding of *Franklin National Bank* does not control the question of the adequacy of the notice given in the instant case. Under the circumstances of this case, the Court believes that the form of the notice of settlement provided was sufficient. *See Maris v. Chase,* 19 F.R.Serv.2d 526 (S.D.N.Y.1974); Haudek, *The Settlement and Dismissal of Stockholders' Actions—Part II: The Settlement,* 22 Sw.L.J. 769, 788 & n.320 (1968).

In awarding counsel fees in a shareholder derivative action, the court, in addition to considering the above mentioned factors, undertakes to determine "the basic value" of the attorney's services, *City of Detroit v. Grinnell Corp.*, 560 F.2d 1093, 1098 (2d Cir. 1977) *(Grinnell II)*, in order to arrive at a "'lodestar'", *id.*, figure. Then the court can evaluate "other less objective factors, such as the 'risk of litigation', the complexity of the issues, and the skill of the attorneys," *id.* at 1098.

This Court, in its decision approving the settlement, found "most persuasive" 81 F.R.D. at 439 the termination of the litigation and the avoidance of further expense and diversion of management from corporate operations. There is no support for the contention of plaintiff's counsel that Continental "will be benefited in cash to the extent of at least $2,000,000." *Affidavit In Support of Application for an Award of Counsel Fees and Disbursements to Plaintiff's Attorneys,* June 22, 1978, p. 3. The $2,000,000 to which plaintiff's attorneys refer is the amount by which Continental agreed to reduce its Incentive Compensation Reserve for 1978. However, the complaint alleged *no wrongdoing with regard to the Incentive Compensation Plan ("ICP")* or its Reserve. Moreover, no tangible fund was ever created as a result of the settlement. The $2 million reallocated from the Incentive Compensation Reserve for 1978 had never constituted a "fund" actually utilized for the purpose of executive compensation. As this Court indicated: "in recent years, the amount actually distributed to key employees pursuant to the ICP has been substantially less than the amount held in reserve for this purpose." 81 F.R.D. at 439. "For example," the Court stated in a footnote, "in 1977, $7,154,000 was held in reserve and only $3,041,500 was distributed; in 1976, $6,048,000 was held in reserve and only $3,552,000 was distributed." 81 F.R.D. at 439 n.2. Further, the Stipulation of Settlement clearly provides that

"3. Nothing in this stipulation, or any order of this Court with respect thereto, shall be deemed to restrict the right of Continental to adopt any new, or revised,

compensation, employee benefit, or incentive plan which in each case is, in the opinion of the Board of Directors, in the best interests of Continental."

Hence, though the Incentive Compensation Reserve was, by virtue of the settlement, reduced by $2 million for 1978, the Board of Directors expressly retained the right to invest the very funds in question in a similar, new compensation, employee benefit, or incentive plan. These factors belie the assertion of plaintiff's counsel that the corporation "will be benefited in cash to the extent of at least $2,000,000," *Affidavit In Support of Application for an Award of Counsel Fee and Disbursements to Plaintiff's Attorneys,* June 22, 1978, p. 3.

In its decision approving the settlement, this court also stated that "[i]t is more difficult to find that Continental derived a substantial benefit from its agreement to comply for three years with its own guidelines and with the law relating to illegal payments. Before this action was commenced, Continental had apparently made an extensive investigation into the payments in question and had taken action to halt any illegal or unethical practices and to inform the public and its shareholders of the results of its investigation and of the corrective action being taken." 81 F.R.D. at 439. Therefore, even prior to the commencement of this shareholder's derivative suit, Continental had taken steps on its own to discharge defendants Burnap and Glenn, to issue a press release announcing their removal, to file an 8–K report with the Securities and Exchange Commission disclosing the results of the investigation and actions taken, and to mail a copy of the portion of the 8–K report describing the results of the investigation to all Continental shareholders. "Plaintiff's review of Continental's investigation disclosed no further illegality." 81 F.R.D. at 439. Indeed, the "'corporate therapeutics'" *Mills v. Electric Auto-Lite, Inc., supra,* 396 U.S. at 396, 90 S.Ct. 616, *citing Murphy v. North American Light & Power Co.,* 33 F.Supp. 567, 570 (S.D.N.Y.1940), had already effectively been undertaken by the corporation itself, of its

own accord, prior to, and without the need of, this shareholder suit. Plaintiff's chances for success on the merits of his claims were not at all good, based upon existing persuasive case law. Hence, plaintiff's shareholder suit was only of minimal benefit to the corporation.

An additional factor to be taken into consideration in awarding counsel fees is the nature of the work performed. In this case, as in *Grinnell I, supra,* "[i]t is conceivable that large amounts of time could have been spent on comparatively routine matters or in ministerial duties." 495 F.2d at 473. Given some of the descriptions of counsel's activities in the Supplemental Affidavit in Support of Counsel Fee, dated July 17, 1978, *e.g.,* "reviewed Continental documents", "worked on Continental records", "researched law", "Legal Research", "[c]ommon sense dictates that some of the work would have been suited to performance by an associate, or even a paralegal employee, who would have commanded a lower rate," *Lewis v. Bergethon, supra,* 1978 Fed.Sec.L.Rep. ¶ 96,289 at 92,841.

 In summary, plaintiff's suit created no tangible fund and produced only a limited, minimal benefit to the corporation. Accordingly, the Court awards counsel fees in the amount of $5,000.00, plus disbursements of $967.47.